UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES DIMRY,<br><br>    Plaintiff,<br><br>    v.<br><br>THE BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN, et al.,<br><br>    Defendants. | Case No. 16-cv-01413-JD<br><br>**ORDER RE MOTIONS**<br>Re: Dkt. Nos. 59, 63 |

Plaintiff Charles Dimry was a cornerback in the National Football League. He was a fifth round draft pick for the Atlanta Falcons in 1988, and played for several other clubs over a twelve-year career. Like many NFL veterans, he left the game with a number of physical injuries. The dispute in the parties' cross-motions for summary judgment is whether the Retirement Board (the "Board") of the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Plan") properly denied Dimry total and permanent disability benefits under the Plan and the Employee Retirement Income Security Act of 1974 ("ERISA"). Dkt. Nos. 59, 63.

## BACKGROUND

The material facts are undisputed. The parties agree that the governing benefits agreement is the amended and restated Plan dated April 1, 2014. Administrative Record ("AR") 001.[1] The Plan is the product of collective bargaining, AR 006, and sets out in Article 5 and Article 8 the pertinent provisions for total and permanent ("T&P") disability benefits.

Article 5 states that a player will be deemed totally and permanently disabled if the Board finds "that he has become totally disabled to the extent that he is substantially prevented from or

---

[1] All AR citations are contained in Exhibit A to Dkt. No. 61.

substantially unable to engage in any occupation or employment for remuneration or profit," and that this condition is permanent. AR 030. Article 8 vests the Board with "full and absolute discretion" to interpret and manage the Plan, and to decide claims for T&P benefits. AR 048-49. The Plan emphasizes that the Board's discretion is "the broadest possible discretion permissible under ERISA and any other applicable laws." AR 052. The Board's voting members consist of three former players appointed by the NFL Players Association and three representatives appointed by the League. AR 048.

Dimry applied on his own for T&P disability benefits in 2014. AR 093. He claimed stenosis and disc disease in his cervical spine, which is the neck area, and a limited range of motion and severe pain following two fusion surgeries. AR 093, 097. He also claimed bilateral knee strains, torn ligaments, lumbar spine degeneration, kidney disease and Crohn's disease, a disorder of the bowel. AR 093. Dimry stated that he had been unemployed since 2012 and had stopped working at his last job with a sports business because he "could no longer stand or lift," "couldn't perform job functions," and could not concentrate from "exhaustion and ongoing pain." AR 095, 097.

Dimry submitted multiple physician assessments with the application. The main report was from Dr. Paul Murphy, who was Dimry's primary treating physician. AR 099. Among other examination-based findings, Dr. Murphy noted chronic neck pain post-dating the fusion procedures, spinal disc herniation, and knee strains. AR 105-06. Dr. Murphy concluded that Dimry "is unable to be employed" due to these "industrially related" injuries. *Id*. Dr. Murphy completed a residual functional capacity questionnaire used by the Social Security Administration, and found that Dimry had no capacity for any meaningful work. AR 107-11. Dimry also provided reports from several other treatment providers who expressed findings and opinions similar to Dr. Murphy's, although in more cursory form. *See* AR 112-49.

In response to the application, the Board required Dimry to submit to an examination by a Plan-selected doctor. AR 159. At the Board's request, Dr. Steven Meier, an orthopedic surgeon in Beverly Hills, California, AR 189, met with and physically examined Dimry in January 2015. AR 173. Dr. Meier found: (1) a decreased range of motion in Dimry's cervical and lumbosacral

2

spine but with capacity to perform mild to moderate activities; (2) no activity limitations in the right knee; and (3) no sitting, standing or walking limitations in the left knee. AR 187. He concluded that Dimry could not perform physically demanding work but that he had the capacity for light work and was not substantially unable to engage in any occupation. AR 188.

In February 2015, the Board voted, apparently by mail ballots and not in person, to deny Dimry's application on the ground that he did not meet the substantially unable to work standard for T&P disability benefits. AR 197-98. Minutes for the Board vote give no indication that it discussed or considered any of the medical reports Dimry submitted, or did anything to weigh or evaluate the record as a whole. *Id*.

The Board promptly advised Dimry of its determination. AR 201. The letter of decision said the Board "noted that the Plan neutral orthopedist -- Steven Meier, M.D., indicated that you are employable." AR 202. No other physicians or medical reports are mentioned, and no explanation is given for the Board's apparent decision to disregard the findings and opinions of Dimry's treatment providers.

Dimry hired a lawyer and filed an internal appeal. AR 218. For the most part, the appeal repeated the prior medical reports submitted with the original application, and criticized the report by Dr. Meier for alleged inaccuracies and inconsistencies. The appeal also raised questions about Dr. Meier's independence and neutrality. It asked for information about how much the Plan had paid Dr. Meier, and how many of his evaluations had been favorable to the Plan versus the claimant. AR 231-32. The administrative record does not show a response by the Plan.

After receiving the appeal, the Board again required Dimry to submit to a medical exam by a Plan-selected doctor. AR 279. This time, the Board directed Dimry to Dr. James Chen, an orthopedic surgeon in San Francisco, California. AR 299. In September 2015, Dr. Chen met with and physically examined Dimry. *Id*. Dr. Chen found signs of degenerative disc disease in Dimry's spine and loss of "two motion segments" but no muscle weakness and no significant knee issues. AR 304-06. He concluded that Dimry should not engage in physical labor but "could do desk or sedentary work." AR 306.

1    In November 2015, the Board voted to deny Dimry's appeal. AR 339. This time, the vote appears to have been in a live meeting and not by mail, but the minutes again do not show that the Board gave any consideration to Dimry's medical submissions, or engaged in an evaluation of the record as a whole. *Id*.

Dimry was again promptly advised of this determination. AR 342. This letter of decision provided a somewhat more detailed explanation of the basis of the denial than the prior letter. The letter referred to Dr. Meier's report, and noted that a second "neutral physician," Dr. Chen, had examined Dimry and reached conclusions about his employability that were consistent with those of Dr. Meier. AR 343. The letter acknowledged "potentially conflicting medical evidence" in the record, but stated that the Board had "credited the findings of the Plan's neutral physicians over that evidence" because it "generally has more confidence in the reports of its neutral physicians." *Id*. The letter added that "neutral evaluations are uniformly accepted and relied upon" by the Board. *Id*.

While this process was unfolding under the Plan, Dimry separately pursued a disability claim with the Social Security Administration ("SSA"). In August 2016, an administrative law judge with the SSA determined that Dimry had been disabled as of October 2012 within the meaning of the Social Security Act. Dkt. No. 66-1 at 1. Based in part on testimony by a vocational expert, the ALJ also found that Dimry's relevant work experience consisted of being a professional athlete and coach, and that he could not meet the demands of that work or transfer those skills to any other job. *Id*. at 7. The ALJ concluded with the determination that "there were no jobs in the national economy that the individual [Dimry] could perform." *Id*. at 8. The parties agree that the SSA decision came out after the Board's denial of benefits, and was not considered in the Board's decisionmaking.

## DISCUSSION

As the Plan acknowledges, Dimry supported his benefits application with "some evidence showing that he was totally and permanently disabled." Dkt. No. 59 at 3. The question is whether the Board properly exercised its discretion to deny an award of benefits.

4

The parties agree, correctly, that the Board's decision to deny benefits is reviewed for abuse of discretion. *Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005). The Court's practice is to conduct that review on summary judgment, and so treats all the pending motions as for summary judgment. *See also Rabbat v. Standard Ins. Co.*, 894 F. Supp. 2d 1311, 1313 (D. Or. 2012) (and cases cited therein). "In the ERISA context, 'a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.'" *Harlick v. Blue Shield of California*, 686 F.3d 699, 706 (9th Cir. 2012) (internal citation omitted).

Whether the review for abuse of discretion should be tempered with a degree of skepticism is a nuanced issue. The existence of a structural conflict -- which arises when the same entity that pays the benefits also decides the claims -- warrants review for abuse of discretion with "skepticism." *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 900 and n.3 (9th Cir. 2016). Dimry does not argue that a structural conflict may be present here, but he contends that skepticism is nonetheless appropriate because the Plan relied on referral doctors who had a financial conflict of interest. Our circuit has held that the reliance of a benefits plan "on the reports of its retained experts who have a financial incentive to make findings favorable" to the plan "may warrant skepticism," even in the absence of a structural conflict. *Id*. at 902. The concern is that a doctor who reaps substantial income or business benefits from plan referrals might allow economic self-interest to influence medical opinions and judgments about a claimant's disabilities. *Id*. at 904; *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) ("physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of 'not disabled.''") (internal citation omitted). This is not to say that referral physicians are per se biased against claimants any more than treating physicians are per se biased in favor of their patients. The party claiming a conflict bears the burden of producing "evidence of a financial conflict sufficient to warrant a degree of skepticism." *Demer*, 835 F.3d at 902. If that showing is successful, the burden shifts to the plan to counter it. *Id*.

Dimry tenders evidence that the Plan paid Dr. Meier, the first orthopedist it retained to examine Dimry, approximately $188,683 in direct compensation between April 2014 and May 2015.[2] That period includes the time in January 2015 when Dr. Meier examined Dimry. This satisfies Dimry's burden of production. The amount paid to Dr. Meier is substantial and exceeds the amounts found to be of concern in *Demer*. 835 F.3d at 902.

The Plan has not rebutted this showing. It does not contest the dollar amounts paid to Dr. Meier, and says mainly that they are of no moment because the Plan's referral physicians are paid a fixed fee for examinations regardless of their final conclusions. Dkt. No. 72 at 1. That may be, but the observation is off point because the inquiry under *Demer* is whether the magnitude of the payments raises a fair inference of a financial conflict. 835 F.3d at 902. The sizable payments to Dr. Meier do just that, and the Plan has not negated the inference by tendering evidence of "neutrality in practice." *Id*. at 903. The Plan suggests that *Demer* is distinguishable because the relationship between the doctors and the plan there was "nothing like" the one here, Dkt. No. 72 at 2, but the Plan does not explain why that is so. In both *Demer* and here, the doctors were "independent" outside physicians called in by the plans to evaluate the claimants. *See Demer*, 835 F.3d at 897-98 (noting use of "independent physician consultants"). The fact that the exams in *Demer* were on the medical records is inconsequential. The conflict analysis turns on the financial incentives to shade reports and conclusions, and not on the nature of the examination.

The financial conflict adds a modicum of skepticism to the standard of review. But the result here would be the same even under a plain review for abuse of discretion. The problem is that the Board denied benefits based upon an unreasonable bias in favor of Plan-selected physicians. Although the Board noted "potentially conflicting medical evidence contained in the record," it did not resolve the conflicts by examining the evidence or delving into the record before it. AR 343. It simply adopted the opinions of its retained physicians by default. *Id*. The Board underscored the reflexive and non-discretionary quality of this action by stating that it

---

[2] This evidence is in Dimry's request for judicial notice, Dkt. No. 71-1 at pg. 3-8 (a single page number and not pages 3 through 8), which the Court grants for this document to evaluate the conflict. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006) (en banc).

6

"uniformly" accepts and relies upon the reports of its retained doctors. *Id.* It is true, as the Plan notes, that the Board owed no special deference to the opinions of Dimry's treating physicians. *Black & Decker*, 538 U.S. at 831. It was also entitled to treat a single medical opinion as sufficient to adjudicate Dimry's claim. *Boyd*, 410 F.3d at 1179. But it was not entitled to decide a benefits claim by mere default to a Plan-selected physician. That is the abandonment of discretion, not the exercise of it.

The Board's conduct is all the more questionable because it is hardly a self-evident proposition that Plan-selected physicians are always more neutral and reliable than a claimant's treating physicians, particularly when an inference of financial conflict arises. It is certainly possible that in any given claim proceeding involving disputed issues, the Plan-selected physicians may reach the sounder conclusions. That might even have been the case here, but nothing in the administrative record gives any explanation to that end.

The Board has little to say in response to this problem. Its main argument is that a denial of benefits to a former player was upheld in *Boyd* and that this Court should do the same. *Boyd* does not compel that result because the record there did not feature an automatic default in favor of a Plan-selected physician, or an inference of financial conflict for that physician. *See* 410 F.3d at 1178-79. The Board's suggestion that "'uniformly' merely highlights the fact that both sides of the Board [the player and League voting members] place confidence in the Plan's neutral physicians," Dkt. No. 59 at 15, does not meaningfully address the issue.

Consequently, the Board's denial of benefits to Dimry was an abuse of discretion. Dimry's request for discretionary statutory penalties under 29 U.S.C. § 1132(c)(1) is declined. Dkt. No. 63 at 18. The parties dispute whether the penalties are available against the Plan itself, but even assuming purely for discussion that they are, the record does not show bad faith on the Plan's part or that Dimry was prejudiced by any delays in receiving documents. *Kronzer v. Hintz*, 601 Fed. App'x. 687, 690 (9th Cir. 2012).

## CONCLUSION

Summary judgment is granted for Dimry on the abuse of discretion in the denial of his benefits application. Statutory penalties are declined. Summary judgment is denied for

7

defendants.

The case is remanded to the Board for re-evaluation of Dimry's T&P benefits claim. Remand is appropriate because the record is mixed and does not clearly establish Dimry's eligibility for benefits. On remand, the Board may want to consider the SSA decision that was not previously available to it. The Court has not relied on the SSA decision for the conclusions reached here.

**IT IS SO ORDERED.**

Dated: March 12, 2018

JAMES DONATO
United States District Judge